UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR PHONE ASSIGNED 702-283-5918, BEARING IMSI 311480521502898 AND IMEI 353342076352953 | Case No. __20-mj-54-01-AJ_____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Jean Drouin, being first duly sworn, hereby depose and state as

follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule

of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of

the cellular telephone assigned call number 702-283-5918 ("Target Cell Phone") bearing IMSI

311480521502898 and IMEI 353342076352953, activated December 30, 2019, Cellco

Partnership DBA Verizon Wireless, with a listed subscriber as Tracfone Wireless, Inc., with

service provided by Cellco Partnership DBA Verizon Wireless a service provider headquartered

at 180 Washington Valley Rd., Bedminster, NJ 07921.  The Target Cell Phone is described

herein and in Attachment A, and the location information to be seized is described herein and in

Attachment B. As described more fully in Attachment B, this application requests data about the

physical location of the Target Cell Phone including but not limited to E-911 Phase II data (or

the specific latitude and longitude or other precise location information) for a period of thirty

(30) days.

2.      I am a Special Agent with the United States Department of Justice, Drug Enforcement

Administration ("DEA").  I have served in this capacity for over 22 years and have been

assigned to the New England Field Division for the past 22 years.  I have received training in the field of narcotics enforcement and investigations including, but not limited to, training regarding the identification of common street drugs such as cocaine and heroin.  During my tenure as a DEA Special Agent, I have worked on more than one-hundred drug investigations.  Many of these investigations involved the organized domestic and international importation and distribution of kilogram quantities of cocaine and heroin. Through my training, education, and experience, I have also become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs.

3.         I have written and/or participated in the execution of numerous search warrants resulting in the seizures of large quantities of controlled substances; packing implements and other paraphernalia involved in the manufacture and distribution of controlled substances; large amounts of United States currency, ledger books, bank records, telephone books, receipts, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances.  I have participated in the debriefing of dozens of defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants and executing arrests. As a result of my assignments, I have received extensive specialized training in the field of narcotics identification, investigation and enforcement.

4.         Based upon my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage and transportation of narcotics and the collection of monies that constitute the proceeds of narcotics trafficking activities.

5.      Based upon my training and experience, I am familiar with narcotics traffickers'

methods of operation, including the distribution, storage, and transportation of narcotics and the

collection of money that constitutes the proceeds of narcotics trafficking activities.  Specifically,

I am familiar with the manner in which narcotics traffickers use vehicles, common carriers, mail

and private delivery services, and a variety of other means to transport and distribute narcotics

and the proceeds of narcotics trafficking.  In particular, I am aware, form the my training and

experience, that drug traffickers often install and use electronic operated hidden compartments in

motor vehicles to transport large quantities of drugs and drug proceeds.


### PROBABLE CAUSE

6.      Since January 2020, the DEA and other law enforcement agencies have been conducting

an investigation of a drug trafficking organization operating throughout New Hampshire and

other states involving methamphetamine being transported from the western United States to the

northeastern United States for redistribution.  On February 12, 2020, law enforcement arrested

two individuals pursuant to this investigation.  Both individuals, hereinafter referred to as Source

of Information (SOI) 1 and SOI 2, voluntarily cooperated with law enforcement with the hope of

potential consideration for pending drug charges.

7.      SOI 1 provided information regarding a methamphetamine source of supply (SOS)

identified by name and photograph, particularly, by directing investigators to an online article

regarding an August 27, 2019 arrest and booking photograph as Matthew SCHNELL in

Concord, New Hampshire for possession of fentanyl with intent to distribute, possession of

fentanyl, and the possession of methamphetamine.  SOI 1 also provided a physical description of

SCHNELL, and identified SCHNELL's phone number as 702-283-5918 (the 5918 phone).

Investigators subsequently identified Matthew SCHNELL, date of birth ⬛⬛⬛⬛⬛ 1980, with a criminal history including arrests for both the sale and possession of controlled drugs, operating after suspension, driving while under the influence, and forgery.

8.      In sum, SOI 1 explained the SCHNELL is responsible for shipping methamphetamine from Nevada to the east coast.  SOI 1 stated SOI 1 and SOI 2 send money to SCHNELL, specifically via Walmart money orders, to pay for methamphetamine.  SOI 1 said SOI 2 primarily deals with SCHNELL, but SOI 1 said on one occasion, SOI 1 dealt with SCHNELL to buy methamphetamine.  SOI 1 said SOI 1 and SOI 2 typically get between one to two pounds of methamphetamine from SCHNELL roughly once per week, and that SCHNELL has supplied them methamphetamine since roughly October 2019.  SOI 1 said SCHNELL communicates information about supplying methamphetamine via telephone calls and text messages.

9.      SOI 1 said SCHNELL was reportedly in Nevada, and was due to return back east on Monday, February 10, 2020, but he was delayed.  SOI 1 said the "pick up," referring to a delivery of methamphetamine from SCHNELL, was then planned for the evening of February 12, 2020 or the following morning, February 13, 2020.  As of the afternoon of February 13, 2020 SCHNELL indicated that his vehicle still is not repaired and he has not arrived in New Hampshire.

10.     SOI 2, independent from SOI 1, provided information regarding SCHNELL, including the name "Matt S," physical description, and multiple phone numbers, including the 5918 phone. SOI 2 said SOI 2 has been supplied methamphetamine from SCHNELL since approximately after Thanksgiving 2019.  SOI 2 said SCHNELL has most recently communicated with SCHNELL via the 5918 phone.  SOI 2 said SCHNELL was reportedly in the Las Vegas, Nevada area, and was supposed to return this past Monday simultaneously with a shipment of

methamphetamine being driven from Nevada to the east coast, possibly the greater Boston area, via a truck.  SOI 2 said SCHNELL is often late with methamphetamine deliveries, but always produces methamphetamine eventually.  SOI 2 said SOI 2 and another individual pre-paid SCHNELL with $16,000 for this upcoming delivery of methamphetamine.  SOI 2 said SOI 2 picked up roughly one pound of methamphetamine from SCHNELL via an unknown male in Manchester, New Hampshire the previous night, as a means to provide SOI 2 with some methamphetamine until the next delivery of methamphetamine.  SOI 2 said the next delivery of methamphetamine from SCHNELL was supposed to occur the following morning, February 13, 2020.  SOI 2 said SOI 2 was expecting SCHNELL to personally deliver himself two pounds of pre-paid methamphetamine, and that SCHNELL said he would also deliver at least three pounds of "cuffed" methamphetamine up front, without yet receiving payment.  SOI 2 voluntarily consented to a search of SOI 2's phone and showed investigators text messages with the 5918 phone.  Investigators observed these messages to contain language consistent with drug distribution.

11.     On February 13, 2020, SOI 2, in the presence of investigators, placed several recorded calls to the 5918 phone.  The first call was unanswered.  The second call was answered by a male voice.  Upon the completion of this call, SOI 2 told investigators SOI 2 recognized this male voice to be SCHNELL.  During this conversation, SCHNELL stated SCHNELL was having truck issues.  In follow up text messages, SOI 2 texted the 5918 phone, "So you really going to be here in the morning?"  The 5918 phone responded, "Could be afternoon evening," and, "truck needed brakes in pa."

12.     I therefore believe that the Target Cell Phone is presently being used to conduct communications in furtherance of a drug distribution conspiracy.  Thus, tracking the Target Cell

Phone will assist in surveillance and likely lead law enforcement to locations and persons involved in drug trafficking.

13.     No tangible property, or wire or electronic communications, shall be seized pursuant to the warrant. To the extent the requested real-time tracking (GPS, cell site, or other) information may constitute stored electronic information under 18 U.S.C. §§ 2701-2711, it is believed 18 U.S.C. § 2703(c)(1)(A) expressly authorizes the provision (by the service provider) and retention ("seizure") by agents of such information. To the extent it may not, there is reasonable necessity for the "seizure" of such information. 18 U.S.C. § 3103a(b)(2). Not allowing agents to retain the information so they may identify the user of the target phone and his/her location would defeat the only purpose of the warrant and render the warrant useless. No stored wire or electronic information shall otherwise be seized pursuant to the warrant.

14.     In my training and experience, I have learned that Cellco Partnership DBA Verizon Wireless is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban

areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a

wireless device does not necessarily serve every call made to or from that device. Accordingly,

cell-site data is typically less precise than E-911 Phase II data.

15.     Based on my training and experience, I know that Cellco Partnership DBA Verizon

Wireless can collect E-911 Phase II data about the location of the Target Cell Phone, including

by initiating a signal to determine the location of the Target Cell Phone on Cellco Partnership

DBA Verizon Wireless networks or with such other reference points as may be reasonably

available.

16.     Based on my training and experience, I know that Cellco Partnership DBA Verizon

Wireless can collect cell-site data about the Target Cell Phone.

## AUTHORIZATION REQUEST

17.     Based on the foregoing, I request that the Court issue the proposed search warrant,

pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

18.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal

Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until

30 days after the collection authorized by the warrant has been completed. There is reasonable

cause to believe that providing immediate notification of the warrant may have an adverse result,

as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the

Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure

would give that person an opportunity to destroy evidence, change patterns of behavior, notify

confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in

Attachment B, which is incorporated into the warrant, the proposed search warrant does not

authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the

extent that the warrant authorizes the seizure of any wire or electronic communication (as

defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable

necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

19.    I further request that the Court direct Cellco Partnership DBA Verizon Wireless to

disclose to the government any information described in Attachment B that is within the

possession, custody, or control of Cellco Partnership DBA Verizon Wireless I also request that

the Court direct Cellco Partnership DBA Verizon Wireless to furnish the government all

information, facilities, and technical assistance necessary to accomplish the collection of the

information described in Attachment B unobtrusively and with a minimum of interference with

Cellco Partnership DBA Verizon Wireless services, including by initiating a signal to determine

the location of the Target Cell Phone on Cellco Partnership DBA Verizon Wireless networks or

with such other reference points as may be reasonably available, and at such intervals and times

directed by the government. The government shall reasonably compensate Cellco Partnership

DBA Verizon Wireless for reasonable expenses incurred in furnishing such facilities or

assistance. I further request that the Court authorize execution of the warrant at any time of day

or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours. I

declare that the foregoing is true and correct.


                                            /s/ Jean Drouin
                                            Jean Drouin
                                            Special Agent
                                            Drug Enforcement Administration

SUBSCRIBED and SWORN to before me this 13th Day of February 2020, in Concord, New
Hampshire.

 /s/ Andrea K. Johnstone
HON. ANDREA K. JOHNSTONE
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

1. The wireless telephone assigned call number 702-283-5918 ("Target Cell Phone") bearing IMSI 311480521502898 and IMEI 353342076352953, activated December 30, 2019, Cellco Partnership DBA Verizon Wireless, with a listed subscriber as Tracfone Wireless, Inc., with service provided by Cellco Partnership DBA Verizon Wireless a service provider headquartered at 180 Washington Valley Rd., Bedminster, NJ 07921.

2. Information about the location of the Target Cell Phone that is within the possession, custody, or control of Cellco Partnership DBA Verizon Wireless including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A. This warrant does not authorize the collection of any content of communications.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Cellco Partnership DBA Verizon Wireless is required to disclose the Location Information to the government. In addition, Cellco Partnership DBA Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Cellco Partnership DBA Verizon Wireless services, including by initiating a signal to determine the location of the Target Cell Phone on Cellco Partnership DBA Verizon Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Cellco Partnership DBA Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).